IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

COREY LEA, pro se

    Plaintiffs,

v.                                               No. 3:23-cv-00340
                                                Judge Trauger / Holmes

THE SECRETARY OF AGRICULTURE,
GARY WASHINGTON,
THE UNITED STATES DEPARTMENT OF
AGRICULTURE, ZACH DUCHENEAUX-FSA,
DEPT. OF AGRICULTURE

    Defendants.

## OBJECTION TO DENYING JOINDER OF FIRST BANK PRESUMABLY WITH PREDJUDICE AND TO CHANGE TO WITHOUT PREJUDICE

Come now Plaintiff Corey Lea to move this court to grant the requested relief in the above styled caption. In an abundance of caution.

**ARGUMENT**

On January 31, 2025, the Magistrate entered several orders on pending motions, DN 80. Most notable, she explained forthcoming orders for a scheduling order and discovery deadlines were to follow. There are no objections from the Plaintiff. However, she went on to deny the motion to joinder of First Bank. The Plaintiff moves the Court to clarify the denial. If it was with prejudice or without prejudice.

The complaint of record shows elements of fraud and conspiracy with the federal defendants. Unquestionably, the claim of the action is real estate in Rutherford County, Tennessee. A county located within the jurisdiction of this Court. In DN 47, the Plaintiff

1

attached exhibits to show that there was pandemic relief being withheld from the Plaintiff from section 22006 of the Inflation Reduction Act, nearly $187,000. The Magistrate stated that that claim was in the complaint of record and could be adjudicated in the final judgment. Moreover, the Plaintiff pointed to a case in the DC District Court, *Provost v. Vilsack,* 1:24-cv-00920 a Black farmer, such as the Plaintiff, by affidavit and exhibit showed that the federal defendants paid the relief belonging to that Plaintiff to the guaranteed bank instead of the Black Farmer/Plaintiff.

In this instance, the Plaintiff beliefs that the federal defendants engaged in the same unlawful conduct that caused him injury. The Plaintiff in this case is a third-party beneficiary to the loans in which he was entitled to pandemic relief, see exhibit in DN 67. Further, now the Federal Defendants have sent 1099 forms to the Plaintiff in which the Plaintiff would owe nearly $175,000 in taxes for unlawful activities of First Bank, the Federal Defendant and other bad actors. If unpaid, the Federal Defendants will then send the IRS to put a lien on the home owned by the Plaintiff and could force the sale of the property belonging to the Plaintiff that is in Rutherford County, Tennessee. For the record, the Plaintiff does not have $175,000 or more to pay the IRS for First Bank and the Federal Defendants unlawful activity.

In essence, the conspiracy between First Bank and the Federal Defendants is a cause and effect that has further caused harm to a Tennessee Resident and will affect real property located within the jurisdiction of this Court. In *ND ACQUISITIONS v. BEL PRE LEASING, LLC,* 15-0796, this Court held "With respect to interstate contractual obligations, the Supreme Court has emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities. Burger King Corp. v. Rudzeqicz, 105 S.Ct. 21174, 2182

(1985); Vireo Systems, 2015 WL 1893461 at * 6. Where a defendant has created continuing obligations between itself and the residents of another forum, it manifestly has availed itself of the privilege of conducting business there. Air Products and Controls, 503 F.3d at 551."

Again stating "Purposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in the forum state or conduct which can be properly regarded as a prime generating cause of the effects resulting in the forum state, something more than a passive availment of the forum state's opportunities. Bridgeport Music, Inc. v. Still N the Water Publishing, 327 F.3d 472, 478 (6th Cir. 2003).

Lastly, this Court has recognized again in *ND Acquisitions* "Moreover, this dispute arises out of Defendants' business relationships with Plaintiff, a business in Tennessee. Plaintiff's causes of action are based exclusively on Defendants' alleged breaches of their contracts with Plaintiff. Tennessee has a substantial interest in seeing that its residents get the benefit of their bargains."

Starting in 2016, the Trump Administration has given out nearly 210 billion in relief to farmers from this from the China Trade Wars to Covid Pandemic Relief, Black farmers such as the Plaintiff received less than one tenth of one percent in further continuing violations of discrimination, see ex. 1.

In Conclusion,

The Plaintiff requests that the motion to joinder First Bank be denied without prejudice.

Respectfully Submitted,

*(signature)*

Corey Lea
P.O. Box 422
Arrington, Tn. 37014
615 308 7787

CERTIFICATE OF SERVICE

I hereby certify that on 2/10/2025 , a true and exact copy of the forgoing pleading was filled in person with the Clerk's office and served upon the parties as indicated below through the United States Mail:

Henry Leventis
Office of the United States Attorney
110 9th Avenue South, #A961
Nashville, TN 37203

s/ S. JAE LIM S. JAE LIM, B.P.R. #034764
 ANICA C. JONES, B.P.R. #025325
Assistant United States Attorneys
719 Church Street, Suite 3300 Nashville, TN 37203
Telephone: (615) 736-5151
Email: jae.lim@usdoj.gov
Email: anica.jones@usdoj.gov

Counsel for Defendant Thomas Vilsack,
Secretary of the United States Department of Agric

*(signature)* 2-10-25



USDA Farm Service Agency
U.S. DEPARTMENT OF AGRICULTURE




# KEEPING FARMERS FARMING:
## BIDEN-HARRIS ADMINISTRATION ASSISTANCE FOR DISTRESSED FARM LOAN BORROWERS






# Introduction

Over the course of the Biden-Harris Administration, at the direction of Agriculture Secretary Tom Vilsack, USDA's Farm Service Agency (FSA) undertook a deliberate and intensive effort to improve its lending programs to provide better customer service to farmers, ensure its loan programs work as intended to keep farmers farming, and modernize its operations to be more accessible, inclusive, and equitable.

To make the agency and its loan programs more responsive to the needs of its farmer customers, this work has included, among other changes, the deployment of several new tools and programs, for example:

- The **Loan Assistance Tool** (launched October 2022) that provides customers with an interactive online, step-by-step guide to identifying the direct loan products that may be a fit for their business needs and to understanding the application process;
- A new **Online Loan Application** (launched December 2023), which is an interactive, guided application that is paperless and provides helpful features including an electronic signature option, the ability to attach supporting documents such as tax returns, complete a balance sheet and build a farm operating plan;
- The **Application Fast Track Pilot Program**, which provides an expedited underwriting process and is estimated to reduce processing times by as much as a 11 hours per eligible application (launched in 166 county FSA offices in August 2023, and expanded nationwide in early 2024);
- An **online direct loan repayment feature** (launched January 2024) that relieves borrowers from the necessity of calling, mailing, or visiting a local USDA Service Center to pay a loan installment;
- A **simplified direct loan paper application** (launched February 2023), reduced from 29 pages to 13 pages;
- A new **educational hub** with farm loan resources and videos (launched April 2024);
- A **Debt Consolidation Tool** (launched August 2024), which is an online feature through farmers.gov that allows agricultural producers to enter their farm operating debt and evaluate the potential impact and savings they would realize should they apply with FSA or a local lender for a debt consolidation loan; and
- The **Distressed Borrowers Assistance Network** (launched September 2024), a national initiative aimed at providing personalized support to financially distressed farmers and ranchers. The network connects borrowers with individualized assistance to help them regain financial stability.

FSA also recently announced significant changes to Farm Loan Programs through the Enhancing Program Access and Delivery for Farm Loans rule, which became effective September 25, 2024. Distressed FLP direct loan borrowers may benefit from the Distressed Borrower Set-Aside program included in the regulation update, which allows qualifying distressed borrowers to set aside up to a full loan installment on certain loans, at a reduced .125% interest rate. This policy change and many others included in the rule are designed to expand opportunities for borrowers to increase profitability and be better prepared to make strategic investments in the enhancement or expansion of their agricultural operations.

This report examines the impact of two key initiatives: a moratorium on adverse actions for direct farm loans due to the COVID-19 pandemic, and the assistance for distressed borrowers, which was made possible by Section 22006 of

Case 3:23-cv-00340   Document 82   Filed 02/10/25   Page 6 of 14 PageID #: 1079



# FSA Farm Loan Portfolio

## Foreclosure Data

In 2021, as a response to the COVID-19 pandemic, the Administration put into place a moratorium on adverse actions for direct farm loans (such as offsetting other government payments, and acceleration and foreclosure for delinquent loan accounts), and requested that guaranteed lenders follow suit. The average of annual foreclosures over the 10 fiscal years prior to the start of the moratorium was 108.

In the three years since, FSA has initiated foreclosures on 12 farms, a significant reduction in historical trends (note that FSA has been drawn into foreclosures of 74 farms where the foreclosure was brought on by the actions of a private lender). Of those 12, five were due to extraordinary circumstances involving complex accounts and/or court orders. In all cases, USDA FSA has not initiated any foreclosures on direct borrowers where there were not significant extenuating circumstances since the moratorium was initiated on January 21, 2021.

| FISCAL YEAR | TOTAL FORECLOSURES | ROLLING 10 YEAR AVERAGE | FSA INITIATED |
|---|---|---|---|
| 2019 | 125 | 116 | 69 |
| 2020 | 77 | 108 | 27 |
| 2021 | 43 | 101 | 7 |
| 2022 | 26 | 94 | 3 |
| 2023 | 17 | 85 | 2 |

## National Chapter 12 Bankruptcy Rates

FSA's commitment to keeping farmers farming is also reflected in the number of national Chapter 12 Bankruptcies. While the number of Chapter 12 bankruptcies is relatively small, it is available only in specific circumstances and is an indicator of much larger trends in farm financial distress and potential losses. Chapter 12 bankruptcies are specific to farms and are typically used to reset the debt load of financially distressed farms to the value of the assets, allowing the operation to continue rather than face liquidation.

- The average number of Chapter 12 Bankruptcies between calendar year (CY) 2007 and 2020 was 494 per year.
- In CY 2022, there were 169 Chapter 12 Bankruptcies nationally.
- In CY 2023, there were 139 Chapter 12 bankruptcies.

CY 2023 demonstrates a 70% reduction from long term averages, and the number of Chapter 12 Bankruptcies in every year of this administration is lower than any year since 2007.



# Inflation Reduction Act (IRA) Section 22006 Assistance

Section 22006 of the Inflation Reduction Act (IRA) provided $3.1 billion for USDA to assist distressed borrowers with certain FSA direct and guaranteed loans and to expedite assistance for those whose agricultural operations are at financial risk. Authorized uses of these funds include payments to qualifying distressed borrowers, the cost of loans or loan modifications for distressed borrowers, or to carry out section 331(b)(4) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1981(b)(4)) with respect to distressed borrowers.

Since the IRA was signed into law in August 2022, FSA has acted swiftly to assist distressed borrowers in retaining their land and continuing their agricultural operations. The first round of automatic assistance, totaling over $800M in assistance to distressed direct and guaranteed borrowers, was announced on October 18, 2022, just two months after the passage of the law, at which point the vast majority of the announced funds had already been credited to borrower accounts.

As of January 15, 2025, FSA has provided more than $2.74B in IRA 22006 assistance to more than 58,000 farm loan borrowers. Under the announcement of the final round of assistance made in December 2024, FSA estimated $300M in additional assistance to be distributed to recipients. Additional funds have been used for the subsidy modification costs of borrower payments and loan modifications.

As part of FSA's concerted effort to work directly with farmers to learn as much about their individual circumstances as possible and improve our services, the agency conducted evaluation interviews with borrowers. The interviews yielded anecdotal as well as data-based information. Included in call-outs throughout the report are some of the stories they shared with FSA in these interviews.

*A farmer in Tennessee told FSA the assistance helped him through a tough time in his life. He started farming with nothing to his name. He is the first generation of his family to return to farming. The program has given him new-found faith that FSA cares for farmers.*

*22006 has provided impactful assistance to those in greatest need...*

Below is a snapshot of some categories of farms and producers that this funding has reached, helping to stave off the loss of farms the United States has experienced since the 1980s:

- 2,714 farms that were facing imminent foreclosure or loss of the farm at the time of assistance
- 29,517 farms that were more than 60 days past due and therefore facing potential foreclosure proceedings if not for the moratorium or guaranteed lender restraint
- 17,957 borrowers who received assistance with debt that had been restructured, deferred or set aside (when a debt term is extended, or a payment is set aside to the end of the note, this debt increases the annual cost of capital for those operations)
- 22,750 borrowers who demonstrated through a cash flow analysis an inability to make their next scheduled installment payment. (Cash Flow-Based Assistance)
- 5,535 borrowers received assistance that cured the borrowers' prior receipt of debt forgiveness from FSA, removing a loan eligibility barrier that can prevent recipients of debt forgiveness from obtaining a loan with the Agency.

- 7,623 producers who received assistance for situations where they remained current with FSA through an action that eroded the financial status of their farm or household. (Following the first round of assistance that provided automatic payments to farmers who had become or remained delinquent, stakeholder organizations raised concerns about farmers who had "done the right thing" and stayed current on their FSA debt by taking actions that significantly eroded the financial status of their farm or household. We addressed these concerns through Extraordinary Measures assistance).

*A cattle and corn producer from Colorado told FSA he would have been severely stressed without the assistance and would not have been able to make his payment that year. This year has been another year of drought and high input prices. Without the assistance previously received, his ability to get past this year would have also been compromised.*

## ...With very limited return to delinquency

FSA has so far made next installment payments to approximately 38,000 direct loan borrowers due to distress. Of those, 7,200 (18%) were currently delinquent again at the time of the announcement of additional assistance in December 2024. 346 (<1%) direct borrowers who received IRA payments also received Primary Loan Servicing to restructure their loans after receiving the assistance. 82% of direct loan installment recipients have remained current.

FSA has provided IRA assistance to approximately 2,700 guaranteed borrower accounts that were either delinquent or in foreclosure. Of those, 184 (7%) were currently delinquent again at the time of the announcement of additional assistance in December 2024. 93% of guaranteed loan assistance recipients have remained current.

*A third-generation farming operation in South Dakota was about to face major difficulties with operating as they were struck, like many farmers, with the high costs of inputs and low pricing on most goods. Because of the Inflation Reduction Act and FSA, this farm was able to survive and has been passed down to the producer's son.*

## ...And high program integrity

- USDA's Office of the Inspector General examined the Extraordinary Measures category of IRA 22006 assistance (OIG Audit 03601-0001-21) and did not identify any issues with the design of the internal controls for the program related to the audit objective, and therefore, did not make any recommendations.
- The Government Accountability Office (GAO Audit GAO-25-107008) examined the other categories of existing IRA 22006 assistance and similarly did not provide any recommendations to FSA.

## ...Addressing historical issues of access

IRA Section 22006 Assistance was targeted toward those most in danger of farm loss, many of whom had difficult relationships with their local FSA office. At the outset of program implementation, Secretary Vilsack made clear to FSA that a major goal of the program was that no farmer misses out on assistance because they lacked a trusted local office or advisor, and that assistance must be distributed equitably, without variation of service between farmers, counties, states, or regions. We addressed these directives in the following ways:

- As of January 15, 2025, 76.1% of the assistance went out as automatic payments based on existing loan records, implemented by the FSA National Office. Automatic payments eliminated any differential servicing that may arise due to access to information, relationship with county office, or ability to navigate program applications.
- The National Office reviewed all potentially adverse decisions in request-based assistance. Under the Cash Flow-Based Assistance category, county offices were given the authority to approve requests based on the criteria for the program, but any decisions that could not be approved at the local office were reviewed by the National Office to ensure consistency. Cash Flow-Based Assistance had a 93% approval rate.
- Under the Extraordinary Measures category of assistance, the entire evaluation of requests for assistance was handled by the "Response Team," consisting of approximately 35 FLP staff members drawn from around the country, who were managed by the National Office and were provided extensive training and opportunity for cross collaboration. All negative decisions had a secondary check by a senior member of the Response Team.



- Under Extraordinary Measures assistance, FSA made individual calls to each borrower that submitted any requests that could not be approved based on the documentation that was submitted. On these calls, FSA walked the borrower through the request and the documentation requirements, and assisted the borrower in completing the application to ensure that all borrowers requesting assistance were not turned away due to incomplete applications. Calling the borrower also gave the Response Team member the chance to review any additional documentation that the borrower could provide to increase the level of assistance for which they qualified. On first submission, 46% of requests were incomplete. In many programs, an application that is incomplete at the deadline receives an adverse determination. With the Response Team making these phone calls, 84% of the borrowers with initially incomplete requests ultimately completed the request with the help of the Response Team member, resulting in $151M in additional assistance to qualifying borrowers. Overall, Extraordinary Measures assistance had an 85% approval rate.
- By walking through Extraordinary Measures assistance requests with borrowers requesting assistance, FSA ensured that all requests were sufficiently documented, resulting in a positive audit by the Office of Inspector General, as referenced above, while also providing assistance to those producers most in need and often difficult to serve due to producers' financial distress and complexity of more conventional financial assistance programs.

*A husband and wife, retired from the military farming in Nebraska got behind on their loan payments and began getting letters from their local office due to their delinquency, stating that they needed to make payments. The letters caused both of them to suffer from severe anxiety and stress, resulting in them needing to seek medical attention. The relief that they experienced when 22006 brought their loans current was immense. They love the land, are making a life and providing for their family and are looking forward to passing the farm on to the next generation.*

### ...With high program customer experience

The 22006 Team surveyed recipients of 22006 assistance from all assistance types. The interviews found that, of the 22006 assistance recipients surveyed:

- 41% had been farming fewer than 10 years
- 27% had been farming for 11-20 years
- 15% had been farming for 21-30 years
- 8% had been farming for 31-40 years
- 9% had been farming for 41+ years
- 35% had their personal home as collateral for the loan
- 78% reported reduced stress, 35% reported sleeping better at night, and 21% reported improved physical health after receipt of the assistance
- 75% said that the timing of the assistance was either good or great
- 88% said that the assistance significantly improved the likelihood of them farming into the future
- 82% said that the assistance improved their hope of passing the farm on to the next generation

*A first-generation veteran cattle rancher from Missouri stated that his operation would have likely not survived 2024 without this assistance. He has suffered from post-traumatic stress disorder (PTSD) in the past and this assistance helped alleviate some of the stress of the farm on him. He has been utilizing his personal income to support his operation, due to increasing input costs. He read about the Extraordinary Measures assistance in his county office newsletter. Though his local office had very limited information about the program in the beginning, he received outstanding service from the National Office IRA Response Team and was extremely happy with the service he received. The assistance reduced stress, helped him sleep better at night, increased his financial freedom, and allowed him to catch up on family living expenses.*

## ...And significant broader economic impacts.

While the economic impacts of these payments will diminish over time as the economy returns to a steady state, the one-time benefits from IRA payments can strengthen local economies and potentially improve resilience and growth prospects. USDA's Economic and Policy Analysis Division (EPAD) provided an analysis of the broader economic impacts of current 22006 assistance. They found that assistance is expected to:

- Generate or support nearly 49,000 jobs.
- Increase household income by $2.471B.
- Contribute to the US Gross Domestic Product by $3.556B.
- Increase gross revenues from total sales of final goods and services by $5.663B.

See FSA's IRA 22006 Economic Impacts graphic for additional information on economic benefits.

# Distribution of 22006 Assistance

Weekly Inflation Reduction Action (IRA) Implementation Report
Payments by State
As of January 15, 2025

Total Amount
$324,552,124

$1,467,737



# IRA 22006 State Data as of January 15, 2025

| STATE NAME | NUMBER OF BORROWERS | NUMBER OF LOANS | IRA PAYMENT AMOUNT* |
|---|---|---|---|
| ALABAMA | 1,319 | 1,820 | $44,888,972 |
| ALASKA | 31 | 57 | $1,467,737 |
| ARIZONA | 350 | 532 | $22,996,102 |
| ARKANSAS | 3,394 | 6,630 | $268,451,671 |
| CALIFORNIA | 993 | 1,513 | $64,001,269 |
| COLORADO | 642 | 1,277 | $33,087,620 |
| CONNECTICUT | 52 | 80 | $3,383,983 |
| DELAWARE | 48 | 67 | $4,475,447 |
| FLORIDA | 851 | 1,516 | $46,650,210 |
| GEORGIA | 1,279 | 2,120 | $87,015,117 |
| HAWAII | 173 | 248 | $3,027,162 |
| IDAHO | 517 | 826 | $28,562,624 |
| ILLINOIS | 529 | 767 | $18,873,661 |
| INDIANA | 348 | 495 | $20,163,991 |
| IOWA | 2,441 | 3,906 | $92,193,147 |
| KANSAS | 2,805 | 4,813 | $81,746,266 |
| KENTUCKY | 2,572 | 4,976 | $76,466,504 |
| LOUISIANA | 1,252 | 2,318 | $79,745,106 |
| MAINE | 245 | 511 | $7,509,941 |
| MARYLAND | 122 | 220 | $11,772,617 |
| MASSACHUSETTS | 227 | 469 | $12,215,258 |
| MICHIGAN | 931 | 1,605 | $42,662,060 |
| MINNESOTA | 1,321 | 2,574 | $68,377,930 |
| MISSISSIPPI | 1,277 | 1,871 | $50,172,169 |
| MISSOURI | 961 | 1,543 | $37,632,961 |
| MONTANA | 591 | 1,049 | $40,350,954 |
| NEBRASKA | 1,308 | 2,260 | $60,765,948 |
| NEVADA | 156 | 195 | $10,164,167 |
| NEW HAMPSHIRE | 108 | 184 | $2,482,521 |
| NEW JERSEY | 178 | 332 | $10,556,030 |
| NEW MEXICO | 900 | 1,441 | $38,388,402 |
| NEW YORK | 910 | 1,966 | $48,172,211 |
| NORTH CAROLINA | 1,047 | 1,986 | $64,202,047 |
| NORTH DAKOTA | 678 | 1,558 | $41,596,460 |
| OHIO | 598 | 858 | $20,202,613 |
| OKLAHOMA | 9,313 | 17,521 | $324,552,124 |
| OREGON | 467 | 758 | $28,012,148 |
| PENNSYLVANIA | 1,481 | 2,962 | $58,726,036 |
| PUERTO RICO | 1,715 | 2,927 | $167,547,797 |
| RHODE ISLAND | 56 | 86 | $1,923,535 |
| SOUTH CAROLINA | 629 | 1,393 | $52,193,935 |

| STATE NAME | NUMBER OF BORROWERS | NUMBER OF LOANS | IRA PAYMENT AMOUNT* |
|---|---|---|---|
| SOUTH DAKOTA | 1,602 | 3,185 | $65,729,986 |
| TENNESSEE | 1,359 | 2,446 | $51,799,619 |
| TEXAS | 3,992 | 7,608 | $198,591,520 |
| UTAH | 878 | 1,766 | $31,189,574 |
| VERMONT | 328 | 627 | $12,520,949 |
| VIRGIN ISLANDS | 11 | 15 | $207,148 |
| VIRGINIA | 1,093 | 1,948 | $53,497,483 |
| WASHINGTON | 601 | 1,138 | $35,328,998 |
| WEST VIRGINIA | 1,370 | 2,368 | $27,383,596 |
| WESTERN PACIFIC (WP) | 22 | 34 | $245,635 |
| WISCONSIN | 2,012 | 3,861 | $73,935,644 |
| WYOMING | 168 | 276 | $13,410,152 |
| GRAND TOTAL: | 58,251 | 105,502 | $2,741,216,756 |

The "Number of Borrowers" and "Number of Loans" may contain duplicates if a borrower received payments from more than one phase of IRA.

*In addition to IRA 22006 funds, these payments utilized $57,842,919.56 of pandemic relief funding from the Consolidated Appropriations Act (CAA) to direct loan borrowers who used FSA's Disaster Set-Aside option during the COVID-19 pandemic.

# Demographics of Direct and Guaranteed Loan Borrowers that Received IRA 22006 Assistance

Demographic information for direct and guaranteed loan borrowers who received IRA 22006 assistance, based on self-reported information, is included in the charts below. This information was gathered and compiled in January 2025, after all IRA 22006 assistance categories were announced. This data is as of January 10, 2025 while assistance is still being distributed for previously announced categories, so does not represent the entirety of IRA 22006 assistance. The state data in the previous section is more recent than the data below, which is why the state data shows higher amounts. *Note that borrower disclosure of demographic information is voluntary, and many borrowers choose not to disclose this information.*

## Recipient Race

| Race | 22006 Recipient Borrower Count | % of 22006 Assistance by Borrower | % of 22006 Assistance by Payment | % of Borrowers in FSA Loan Portfolio | % of Borrowers Assisted by 22006 in Portfolio^ | 22006 Assistance as % of Outstanding Debt |
|---|---|---|---|---|---|---|
| American Indian/Alaskan Native and Other Races** | 3,082 | 6.43% | 3.11% | 2.68% | 93.48% | 15.53% |
| American Indian/Alaskan Native Only | 4,785 | 9.98% | 8.92% | 5.47% | 70.99% | 13.50% |
| Asian American and Other Races** | 56 | 0.12% | 0.04% | 0.11% | 42.11% | 4.20% |
| Asian American Only | 458 | 0.95% | 2.10% | 1.27% | 29.17% | 4.46% |
| Black/African American and Other Races** | 198 | 0.41% | 0.13% | 0.23% | 69.23% | 10.87% |
| Black/African American Only | 2,225 | 4.64% | 3.96% | 1.66% | 109.07% | 41.99% |
| Pacific Islander/Hawaiian and Other Races** | 36 | 0.08% | 0.02% | 0.06% | 46.75% | 5.45% |
| Pacific Islander or Hawaiian Only | 96 | 0.20% | 0.08% | 0.15% | 50.26% | 6.50% |
| White and Other Races** | 2,137 | 4.46% | 1.82% | 2.79% | 62.07% | 8.70% |
| White Only | 30,436 | 63.46% | 60.38% | 76.68% | 32.21% | 5.40% |
| Not Provided/Prefer Not to Share | 605 | 1.26% | 1.49% | 2.49% | 19.71% | 3.36% |
| Not Verified | 5,600 | 11.68% | 17.38% | 9.40% | 48.33% | 14.96% |
| Grand Total* | 47,960 | | | | | |

**is designated as multi-race category. Borrower Count is duplicative across multi-race categories. For example, if the customer identifies as Black/African American and American Indian/Alaskan Native, they will be counted 1 under Black/African American and Other Races and 1 under American Indian/Alaskan Native and Other Races. However, the amount is divided equally across the races that made up the multi-race category. In this example, Black/African American and Other Races has half of the amount and American Indian/Alaskan Native and Other Races has the other half of the amount, so the amount is not duplicative in the multi-race category.

*Borrower Count is not duplicative in the Grand Total.

^ Percentages greater than 100 may be evident of borrowers having received payments in full and no longer being counted in the borrower portfolio

## Recipient Ethnicity

| Ethnicity | 22006 Recipient Borrower Count | % of 22006 Assistance by Borrower | % of 22006 Assistance by Payment | % of Borrowers in FSA Loan Portfolio | % of Borrowers Assisted by 22006 in Portfolio | 22006 Assistance as % of Outstanding Debt |
|---|---|---|---|---|---|---|
| Hispanic or Latino | 3,261 | 6.80% | 8.29% | 3.14% | 84.33% | 23.94% |
| Not Hispanic or Latino | 38,377 | 80.02% | 72.56% | 85.18% | 36.56% | 5.79% |
| Not Provided/Prefer Not to Share | 721 | 1.50% | 1.64% | 2.47% | 23.72% | 3.57% |
| Not Verified | 5,603 | 11.68% | 17.51% | 9.22% | 49.32% | 15.62% |
| Grand Total | 47,960 | | | | | |

## Recipient Gender

| Gender | 22006 Recipient Borrower Count | % of 22006 Assistance by Borrower | % of 22006 Assistance by Payment | % of Borrowers in FSA Loan Portfolio | % of Borrowers Assisted by 22006 in Portfolio | 22006 Assistance as % of Outstanding Debt |
|---|---|---|---|---|---|---|
| Family Unit | 325 | 0.68% | 2.31% | 1.54% | 17.07% | 7.46% |
| Female/Female Owned Organization | 7,003 | 14.60% | 9.45% | 10.79% | 52.69% | 8.41% |
| Male/Male Owned Organization | 34,014 | 70.92% | 69.87% | 78.61% | 35.11% | 5.81% |
| Non-Binary/Nonbinary Owned Organization | 5 | 0.01% | 0.01% | 0.02% | 36.36% | 6.11% |
| Not Provided/Prefer Not to Share | 167 | 0.35% | 0.48% | 0.01% | 11.66% | 1.76% |
| Not Verified | 5,652 | 11.78% | 15.76% | 1.16% | 68.69% | 28.94% |
| Other/Other Organization | 763 | 1.59% | 1.83% | 6.68% | 56.06% | 12.43% |
| Public Body | 33 | 0.07% | 0.29% | 1.10% | 27.50% | 10.67% |
| Grand Total | 47,960 | | | | | |

## Recipient Veteran or Beginning Farmer/Rancher Status

| Veteran | 22006 Recipient Borrower Count | % of 22006 Assistance by Borrower | % of 22006 Assistance by Payment | % of Borrowers in FSA Loan Portfolio | % of Borrowers Assisted by 22006 in Portfolio | Amount of 22006 Assistance as % of Outstanding Debt |
|---|---|---|---|---|---|---|
| No | 39,945 | 83.29% | 75.73% | 85.91% | 37.73% | 6.22% |
| Yes | 2,066 | 4.31% | 4.12% | 3.24% | 51.75% | 11.74% |
| Unknown | 5,951 | 12.41% | 20.15% | 10.85% | 44.50% | 10.41% |
| Grand Total | 47,960 | | | | | |

| Beg. Farmer Indicator | 22006 Recipient Borrower Count | % of 22006 Assistance by Borrower | % of 22006 Assistance by Payment | % of Borrowers in FSA Loan Portfolio | % of Borrowers Assisted by 22006 in Portfolio | Amount of 22006 Assistance as % of Outstanding Debt |
|---|---|---|---|---|---|---|
| BF | 28,488 | 59.40% | 44.39% | 61.89% | 37.35% | 5.55% |
| Non-BF | 19,473 | 40.60% | 55.61% | 38.11% | 41.46% | 8.62% |
| Grand Total | 47,960 | | | | | |

USDA is an equal opportunity provider, employer, and lender